JOURNAL ENTRY AND OPINION
Defendant-appellant Derrick Washington ("appellant") appeals from his conviction for grand theft in violation of R.C. 2913.02.
Appellant assigns the following errors for review:
 I. APPELLANT'S CONVICTION FOR GRAND THEFT IS NOT SUPPORTED BY SUFFICIENT EVIDENCE WHERE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT HE WAS AWARE OF THE SOURCE OF MONEY.
 II. APPELLANT WAS DENIED DUE PROCESS BY THE ADMISSION OF IDENTIFICATION TESTIMONY THAT HAD BEEN TAINTED IN AN IMPROPERLY SUGGESTIVE IDENTIFICATION PROCEDURE AND LACKED SUFFICIENT INDICIA OF RELIABILITY.
 III. THE PROSECUTOR'S ARGUMENT THAT APPELLANT SPENT "TAXPAYER" MONEY WAS NOT SUPPORTED BY THE EVIDENCE AND WAS IMPROPERLY USED BY THE PROSECUTOR TO APPEAL TO BIAS OF THE JURY.
 IV. THE ARGUMENT BY THE PROSECUTOR THAT AN INFERENCE OF GUILT SHOULD BE DRAWN FROM AN INDIVIDUAL'S CONSULTING AND RETAINING AN ATTORNEY AMOUNTED TO PROSECUTORIAL MISCONDUCT AND CONSTITUTED PLAIN ERROR.
 V. TRIAL COUNSEL'S REPRESENTATION OF APPELLANT WAS BELOW THE STANDARD OF COMPETENCE REQUIRED SO THAT APPELLANT WAS DENIED A FAIR TRIAL.
 VI. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON "DELIBERATE IGNORANCE" WHERE THE INSTRUCTION WAS NOT WARRANTED BY THE EVIDENCE AND THE INSTRUCTION OMITTED A NECESSARY ELEMENT.
Finding the appeal to lack merit, the judgment of the trial court is affirmed.
 I.
On April 1, 1997, the City of Cleveland ("Cleveland") mistakenly caused six hundred seventeen thousand five hundred ninety-six dollars and ninety-nine cents ($617,596.99) to be wired into the bank account of Black on Black Crime, Incorporated ("Black on Black") Cleveland did not discover its error for five months. The actions of Black on Black and certain of its members with regard to the money eventually spawned a civil suit seeking recovery of the money and led to the indictment of Black on Black, appellant, Abdul Hasan, and Arthur McKoy.
Black on Black is a grass-roots organization started twenty-five to thirty years ago by Arthur McKoy with the purpose of helping the community. Black on Black incorporated on January 19, 1994, in order to gain non-profit status. In 1996, Black on Black administered a program known as "Because We Care" which primarily provided tutoring services for children and adults. Black on Black was given a vendor number by Cleveland when the program received a ten thousand dollar ($10,000.00) matching grant from the city. The grant would reimburse Black on Black for documented expenses which were determined to be acceptable. This case began when Black on Black's vendor number was entered into the computer by a Cleveland employee instead of the correct vendor number, causing the money to be sent mistakenly into Black on Black's bank account.
Black on Black learned of the sudden increase in its fortunes in April or May of 1997, when Abdul Hasan, the Chairman of the organization, entered a KeyBank office and inquired of Gwendolyn Wren about the status of Black on Black's bank account. Wren was familiar with both Hasan and McKoy, Black on Black's President, because they were often in the bank. Wren informed Hasan that over six hundred thousand dollars ($600,000.00) was in the group's account. Hasan was astounded at the amount and stated that there must be a mistake. Black on Black's bank account normally carried a balance of between one hundred dollars ($100.00) and five hundred dollars ($500.00). Wren told Hasan that a federal wire transfer had been made to Black on Black's bank account. Wren checked with KeyBank's wire room and then told Hasan that the money came from the City of Cleveland, National City Bank. Wren stated she told Hasan to telephone National City Bank if he had any further questions or wanted verification regarding the amount of money and the source.
An anonymous wire transfer is not possible under federal law. The Federal Reserve Bank requires that the originator be stated in a customer transfer. In the normal course of business, KeyBank sends a wire transfer recipient a notice or confirmation of the credit showing the sequence number, amount, and the originator. The sequence number can be used to trace the money sent in the wire transfer. The notice is sent to the same address as is shown on the customer's bank statement. Black on Black should have been mailed a notice on April 1, 1997. The notice would have been mailed to the same address to which all of Black on Black's bank statements are sent, the address being a barber shop owned by McKoy.
McKoy testified at trial that Hasan told him about the money in April. McKoy stated he instructed Hasan to check with the bank to make sure the money actually belonged to Black on Black. Hasan returned the following week and informed McKoy that, according to the bank, the money really was in their bank account. A month later, McKoy asked Hasan to contact an attorney and an accountant to determine what should be done with the funds. Hasan still maintained he could not discover the source of the money. McKoy averred that he guessed the money may have been a donation from either Albert Belle or Mike Tyson.
In early May, Hasan and McKoy used some of the money to purchase a jumbo certificate of deposit. On May 28, 1997, McKoy, Hasan, and appellant returned to KeyBank and closed out the jumbo certificate of deposit. Donna Pinkney, the bank manager, told the men that there would be a penalty for closing the certificate of deposit early but the men did not care. McKoy and Hasan signed the certificate of deposit withdrawal. The withdrawal amounted to three hundred ninety-five thousand, eight hundred thirty-six dollars and twenty-eight cents ($395,836.28), after the penalty was deducted. The men requested that four cashier's checks be drawn up with the proceeds from the certificate of deposit. Appellant received a cashier's check for one hundred thirty-five thousand dollars ($135,000.00), Hasan's check was for two hundred thirty-five thousand dollars ($235,000.00), Larry Penn received a check for one hundred thirty-five thousand dollars ($135,000.00), and a eighty-five thousand dollar check ($85,000.00) was given to Eric Norvell. McKoy did not receive a check after stating he did not want any money. Money from Black on Black's bank account was used to make up the difference between the total amount of the checks and the proceeds from the jumbo certificate of deposit.
The money was to be used to fund four different companies. Hasan was to be in charge of a construction company; Norvell headed a bonding company to help people raise their bond money; Penn was in charge of "Fun Tours"; and appellant already had his own insurance company. Penn testified that how to use the money was discussed at executive sessions but never at general meetings. The general members were not told that Black on Black received a large amount of money or any money at all. Donations still were being solicited from members to fund various projects. Appellant first mentioned Fun Tours to Penn. Penn knew little about the company he was to head other than it primarily arranged travel for people who could not afford to visit imprisoned family members. Hasan gave Penn the check for one hundred thirty-five thousand dollars ($135,000.00). Hasan and appellant accompanied Penn to the bank to deposit the check. Appellant gave the bank an identification number to use on the accounts Penn opened. Penn obtained a twenty-four thousand dollar ($24,000.00) cashier's check from the money. The check was used to buy a Mercedes Benz.
Earlier, appellant had contacted a Mercedes Benz dealer and arranged to purchase a 1991 Mercedes Benz. Appellant called the dealer again from the bank to make further inquires about the vehicle. Appellant arrived at the dealership with Hasan and two other people. Appellant had a check for the automobile in his hand. Appellant purchased the Mercedes Benz in the name of Fun Tours. Hasan drove the car from the dealership and thereafter. Appellant also bought a used Cadillac through the insurance company appellant owned. The title to the Cadillac was transferred to "Fun Tours." Penn reimbursed the Excellent Insurance Agency for the Cadillac from the Fun Tours account. Penn drove the Cadillac but, apparently, never used the vehicle to transport anyone to prison for visitation. Penn testified that McKoy was upset upon learning about the purchase of the two luxury vehicles. McKoy stated that if someone came looking for the money or inquiring about the money, then Black on Black had better have all the money to return.
Appellant divided his money into a corporate checking account in the name of his insurance company, Excellent Insurance Agency, and a personal savings account. Appellant spent all but one hundred twelve dollars ($112.00) of the one hundred thousand dollars that he put in his corporate account. Appellant used the corporate account to pay the sewer and water bills for his home. The thirty-five thousand dollars ($35,000.00) appellant deposited into his personal account was co-mingled with funds appellant received from the Veterans Administration. The account had a negative balance by September of 1997. Appellant spent fifteen thousand dollars ($15,000.00) on some property which he purchased in the name of the Excellent Insurance Agency from the City of Cleveland. Appellant's and Hasan's banking statements were sent to the same post-office box.
Hasan used money to pay a contractor for repairs which were supposed to be done on property purchased with the money. Hasan's son and father received payments. Norvell also paid Hasan's son from the eighty-five thousand dollars ($85,000.00) he received. McKoy's daughter received a salary from Black on Black.
These expenditures were not permissible for a non-profit corporation. Assets or earnings of such an organization cannot be used for some private benefit or to benefit private individuals or interests. A non-profit corporation is not allowed to purchase real or personal property and title it in the name of a private individual or company.
On August 27, 1997, Cleveland finally discovered it had misplaced the money by having it wired into Black on Black's bank account. Cleveland contacted Black on Black's attorney about the matter. The attorney met with the City Treasurer and offered a payment plan. The City Treasurer rejected the payment plan and demanded full repayment at once.
In September of 1997, Penn met with appellant, Hasan, and McKoy after Black on Black admitted discovering Cleveland was the source of the money. Hasan directed Penn to withdraw twenty thousand dollars ($20,000.00) in cash from the bank. Penn accompanied Hasan to the office of Black on Black's attorney where Penn left the money on the attorney's desk.
McKoy testified that he considered himself to be the spokesperson for Black on Black and he was not involved in the financial aspects of the organization. Hasan was responsible for the group's banking and other financial transactions and concerns. McKoy stated that he relied on Hasan to determine the source of the money which appeared in Black on Black's bank account and what could be done with the money. McKoy denied having any idea about where the money came from but thought Belle or Tyson gave the money anonymously. McKoy averred he did not learn the money belonged to Cleveland until late August or early September. McKoy never asked KeyBank himself about the source of the money. McKoy testified he did try to contact Belle and Tyson but was unsuccessful in his efforts. McKoy stated that it never occurred to him that Cleveland might be the source of the money.
Appellant, Hasan, and McKoy were arrested for aggravated theft. Black on Black also was indicted on a charge of aggravated theft. Cleveland filed a civil lawsuit against Black on Black and various officers and members of the organization. The jury returned guilty verdicts against Black on Black, appellant, McKoy, and Hasan for grand theft.
 II.
Appellant's first assignment of error challenges the sufficiency of the evidence supporting his conviction. Appellant argues that no direct evidence was admitted at trial showing that appellant knew the source of the money or that Black on Black did not legally possess the money.
Sufficiency is a legal standard which is applied to determine whether the evidence admitted at trial is legally sufficient to support the verdict as a matter of law. State v. Thompkins
(1997), 78 Ohio St.3d 380.
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus. In essence, sufficiency is a test of adequacy. Whether the evidence presented in a case is legally sufficient to sustain a verdict is a question of law and a conviction based upon legally insufficient evidence constitutes a denial of due process. Thompkins, supra.
Appellant was convicted of grand theft in violation of R.C.2913.02(A) which provides:
 No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 (1) Without the consent of the owner or person authorized to give consent;
 (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
(3) By deception;
(4) By threat.
Appellant contends there was no evidence introduced showing that he had a purpose to deprive the owner of its money or that he knowingly exerted unlawful control over another's property. Appellant argues that no direct evidence was admitted at trial showing he was aware that the money had come from Cleveland or that he knew Black on Black did not legally possess the funds. Appellant asserts he was only a member of Black on Black and not a part of its inner circle.
The evidence introduced at trial actually shows the opposite. Although appellant was not an officer of the organization, he was involved closely with the officers, particularly Hasan. The state presented evidence that Hasan was told Cleveland was the source of the money or, at least, directed as to how to discover that information by making a telephone call. Appellant was present at the executive sessions where the money was discussed in detail. Hasan, McKoy, and Penn were present at these executive sessions. Appellant first mentioned using Penn's share to fund Fun Tours. Appellant shared a post-office box with Hasan and often was in Hasan's company. Appellant was present at the bank with Hasan when Penn was given his share of the money. Appellant arranged for the purchase of both luxury vehicles. Further, appellant was the only non-officer of Black on Black to receive one of the four checks issued after the jumbo certificate of deposit was closed.
Appellant's use of the money he received certainly indicates appellant knew or should have known the money did not rightfully belong to Black on Black. Appellant immediately placed the money he received in his own corporation's bank account and in his own savings account. He then used the money to pay numerous personal expenses and to buy personal and real property which was not titled to Black on Black or apparently ever used to further the purposes of the group.
Viewing the evidence in a light most favorable to the prosecution, we must conclude the state met its burden of presenting sufficient evidence on each element of the offense charged to prove beyond a reasonable doubt that appellant committed the offense of grand theft.
Appellant's first assignment of error is not well-taken.
 III.
In his second assignment of error, appellant contends the trial court erred by permitting the admission of identification testimony which lacked sufficient indicia of reliability. Appellant argues that the identification testimony of Donna Pinkney identifying appellant as the third person in the bank with Hasan and McKoy when the jumbo certificate of deposit was closed was based upon a single photograph shown Pinkney by the police. Appellant asserts that the procedure of displaying only one photograph to Pinkney tainted the identification process to such a degree that the identification of appellant by Pinkney should have been excluded.
At trial, appellant withdrew his motion to strike both the out-of-court and in-court identifications of appellant by Pinkney. Therefore, appellant made no objection below regarding his identification by Pinkney. Appellant also never sought to suppress the identification evidence. The failure of appellant to raise a defense to the identification process or to object results in waiver of the issue of the admission of the evidence at trial. Crim.R. 12(G); State v. Salwan (May 30, 1996), Cuyahoga App. No. 68713, unreported.
Because appellant has waived any assertion of error with regard to the identification of appellant by Pinkney, this court will analyze the identification process for plain error. Crim.R. 52(B). An alleged error does not constitute plain error "unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Long (1978), 53 Ohio St.2d 91, at paragraph two of the syllabus. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. Id. at paragraph four of the syllabus.
Appellant argues that Pinkney's identification of appellant's presence at the bank when the jumbo certificate of deposit was closed constituted the only evidence placing him near the inner circle of Black on Black. The record shows otherwise. Larry Penn testified that appellant was present at executive meetings during which the money was discussed in detail, including what would be done with the money. Both Penn and Emery Streeter, the Mercedes salesman, place appellant with Penn and Hasan at the dealership when the Mercedes was purchased. Appellant was present at a meeting with Penn, Hasan, and McKoy after Cleveland demanded repayment. Appellant and Hasan's bank statements were sent to the same post office box. There was ample evidence, aside from Pinkney's identification, showing appellant's close association with the officers of Black on Black. The outcome of the trial would not have been clearly different but for the admission of the identification testimony. No plain error exists.
Appellant's second assignment of error is overruled.
 IV.
Appellant's third and fourth assignments of error will be addressed together as similar issues of law are involved. Appellant argues that the prosecutor engaged in misconduct during opening and closing arguments and during cross-examination.
A prosecuting attorney's conduct during trial does not constitute a ground for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19,24. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982),455 U.S. 209, 219. The effect of the prosecutor's alleged misconduct must be considered in light of the whole trial. Statev. Maurer (1984), 15 Ohio St.3d 239, 266.
Appellant contends that the prosecutor's statements during opening argument that appellant spent taxpayer money were so inflammatory and prejudicial that appellant was denied a fair trial. Appellant maintains that he never received any money from the taxpayers but from Black on Black.
Both the prosecution and the defense have wide latitude during opening and closing arguments. The trial court generally determines the propriety of statements made during opening argument. State v. Loza (1994), 71 Ohio St.3d 61, 78. Opening argument is not evidence but is intended to advise the jury what counsel expects the evidence to show. State v. Turner (1993),91 Ohio App.3d 153. Therefore, the prosecutor and defense counsel may, in good faith, make statements as to what he or she expects the evidence will show. State v. Colley (1946), 78 Ohio App. 425,427. The conduct by the prosecutor must have been so extreme so as to deprive the defendant of a fair trial in order for reversible error to be present. State v. Keenan (1993), 66 Ohio St.3d 402.
During opening argument, the prosecutor spoke of the property purchased in the name of appellant's company. The prosecutor mentioned that the contractor never did the work which he was paid to perform and that this was a waste of taxpayer money. Hasan's defense attorney objected to the statement. Later, Hasan's attorney and counsel for Black on Black both referred to taxpayer money during their opening statements.
Appellant's contention that he received the money from Black on Black and not from the taxpayers is disingenuous. Obviously, the prosecutor was referring to the source of the money. The prosecutor's reference to "taxpayer money" was based upon evidence later admitted at trial. The statement was not misleading or inaccurate.
Appellant also objects to statements made by the prosecutor during closing argument. The test regarding prosecutorial misconduct in closing argument is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. State v. Smith (1984),14 Ohio St.3d 13, 14. A prosecutor is afforded wide latitude in closing arguments. State v. Jacks (1989), 63 Ohio App.3d 200,210. It is within the trial court's sound discretion to determine whether a prosecutor has gone beyond the bounds permitted. Statev. Benge (1996), 75 Ohio St.3d 136. A judgment will not be reversed if it is clear beyond a reasonable doubt that, absent the prosecutor's remarks, the jury would have found the defendant guilty. State v. Loza (1994), 71 Ohio St.3d 61, 78. Closing arguments must be viewed in their entirety to determine whether the disputed remarks were prejudicial. State v. Mann (1993),93 Ohio App.3d 301, 312.
Appellant never raised objections to the prosecutor's closing argument. Any alleged improprieties in the prosecutor's remarks are waived absent plain error. See Crim.R. 52(B); State v. White
(1998), 82 Ohio St.3d 16. Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent the manifest miscarriage of justice. State v. Landrum
(1990), 53 Ohio St.3d 107, 111.
Appellant asserts that the prosecutor's remarks concerning expenditures he made were speculative because no direct connection was made between the one hundred thirty-five thousand dollars ($135,000.00) appellant received from the Black on Black account and personal funds of appellant's. The evidence showed that appellant opened a corporate account and a personal account after receiving the money from Black on Black. Later, deposits of funds received from the Veterans Administration were placed in the personal account. Appellant paid his sewer and water bills from the corporate account which consisted only of Black on Black funds. Appellant chose to co-mingle the Black on Black money with payments he received from the Veterans Administration in his personal account. That account had a negative balance on September 10, 1997. Appellant can not use his action of mixing the Black on Black monies with his own to shield his financial misdeeds. The prosecutor's comments regarding appellant's expenditures were based upon the evidence and were not prejudicial.
Lastly, appellant contends plain error is present in the prosecutor's argument that the defendants' actions of contacting an attorney raised an inference of guilt. The prosecutor's direct questions, argument, and remarks concerning the defendants' use of the money to pay for the services of an attorney were based on the evidence and permissible because the state needed to trace what happened to the money, as much as possible. However, any inference by the prosecutor about the defendants' guilt because they obtained an attorney was improper. After considering the remarks in context of the entire trial, appellant received a fair trial.
Appellant's third and fourth assignments are overruled.
 V.
In his fifth assignment of error, appellant argues he was denied effective assistance of counsel at trial. Appellant submits his attorney's performance fell below acceptable standards for the failure to call witnesses in appellant's behalf, for inadequate cross-examination of the state's witnesses, and for not addressing the issue of the sufficiency of the evidence in closing argument.
To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668, 687. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. State v. Smith (1987), 36 Ohio App.3d 162. Ineffectiveness is demonstrated by showing that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. Statev. Hamblin (1988), 37 Ohio St.3d 153. To establish prejudice, a defendant must show that there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland, supra. at 694.
Appellant contends his attorney's failure to call any defense witnesses constituted ineffective assistance of counsel. The failure to call defense witnesses usually is considered to be a matter of trial strategy. State v. Oliver (1995), 101 Ohio App.3d 587. The mere failure to subpoena witnesses does not render counsel's assistance ineffective absent a showing of prejudice.State v. Coulter (1992), 75 Ohio App.3d 219, 230.
Appellant maintains that his attorney should have called a witness to rebut the testimony of state's witness Detective James Brady that the Excellent Insurance Agency was not an existing and operating company prior to April 1, 1997. There was other testimony admitted at trial relating to the existence of the Excellent Insurance Agency prior to April 1, 1997. The timing of the incorporation of the company was less important to appellant's defense than the undisputed fact that appellant deposited one hundred thousand dollars ($100,000.00) into the corporate account of the Excellent Insurance Agency, money which he received from Black on Black. There were no funds in the account prior to this deposit. The failure of appellant's counsel to establish the incorporation date of the Excellent Insurance Agency was not prejudicial to appellant's defense.
Appellant further posits that his attorney did not prove appellant received nearly twenty thousand dollars ($20,000.00) from the Veterans Administration. Appellant's defense counsel did cross-examine Detective Brady and established the amounts appellant received from the Veterans Administration as well as the dates on which the payments were made.
Appellant objects to the failure of his attorney to cross-examine six of the state's ten witnesses. Whether to cross-examine witnesses and the extent of that cross-examination is a tactical matter committed to the sound discretion of trial counsel and does not generally constitute ineffective assistance.State v. Otte (1996), 74 Ohio St.3d 555. There is a strong presumption that a defense attorney's conduct falls within the wide range of reasonable assistance. State v. Nobles (1995),106 Ohio App.3d 246. Three other defendants were tried at the same time as appellant. Two of the defense attorneys cross-examined witnesses prior to appellant's attorney. The decision to forgo cross-examination in this situation falls within the purview of trial strategy. Further, appellant never indicates in his brief which of the witnesses should have been examined by his counsel. Therefore, appellant has not demonstrated prejudice.
Lastly, appellant contends his attorney's closing argument was inadequate because it did not address the issue of the sufficiency of the evidence against appellant. A review of the closing argument shows that defense counsel did raise the issue of appellant's place in Black on Black as a non-officer who was not a signatory on Black on Black's account. Appellant's attorney also questioned Pinkney's identification of appellant and raised lack of intent as a defense. The presentation of opening and closing argument is a matter of trial strategy for which counsel enjoys a strong presumption of competency. State v. Wu (May 27, 1997), Butler App. No. CA96-08-161, unreported. A reviewing court "must refrain from second-guessing the strategic decisions of trial counsel." State v. Carter (1995), 72 Ohio St.3d 545, 558. Defense counsel delivered an adequate closing argument on appellant's behalf.
Appellant's fifth assignment of error lacks merit.
 VI.
In his sixth assignment of error, appellant challenges his conviction based upon the trial court's instruction to the jury that the defendants acted knowingly if they deliberately ignored what they had reason to believe were facts. Appellant contends that this "deliberate ignorance" instruction was improper because it was not warranted by the evidence presented at trial.
A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence. State v. Williford (1990), 49 Ohio St.3d 247. Jury instructions should be tailored to fit the facts of each case. Avon Lake v. Anderson (1983), 10 Ohio App.3d 297. "The trial court is to instruct the jury by clearly and concisely stating the principles of law necessary to allow a fair verdict and the administration of justice." State v. Baker (1993),92 Ohio App.3d 516, 536.
When we review the trial court's charge, a "single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." State v. Price
(1979), 60 Ohio St.2d 136, 141. A reviewing court must consider the whole charge as given rather than separate portions of the charge. State v. Grambo (1949), 82 Ohio App. 473. A judgment will not be reversed if a portion of the general charge is improper and misleading unless the entire charge resulted in prejudicial error. State v. Porter (1968), 14 Ohio St.2d 10.
The portion of the jury charge to which appellant objects is as follows:
 No one can avoid responsibility for a crime by deliberately ignoring the obvious.
 You may further find that the defendants acted knowingly if you find beyond a reasonable doubt that they deliberately closed their eyes to what they had reason to believe were the facts. Carelessness or negligence or foolishness on their part is not the same as knowledge and is not enough to convict.
 This, of course, is all for you to decide.
 How determined. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.
 You will determine from these facts and circumstances whether there existed at the time in the mind of the defendants an awareness of the probability that the money was the property of another, that the defendants did not have the consent of the owner, the City of Cleveland, or a person authorized to give consent, or to obtain or exert control over said money, and that the defendants had a specific intention to deprive the owner of that money.
(Tr. 1703-1704.) This jury instruction is known as the "deliberate ignorance" or "ostrich" instruction. The instruction equates actual knowledge with the deliberate avoidance of knowledge. United States v. Ramsey (7th Cir. 1986), 785 F.2d 184. The purpose of the instruction "is to inform the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings." United States v. Rodriguez
(7th Cir. 1991), 929 F.2d 1224, 1227. The instruction should not be given if the defendant had either actual knowledge or no knowledge at all of the facts in question. United States v.Perez-Padilla (9th Cir. 1988), 846 F.2d 1182.
The deliberate ignorance charge is proper when the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.United States v. White (8th Cir. 1996), 794 F.2d 367, 391. A jury is not permitted to infer a defendant's guilty knowledge based upon a showing of mere careless disregard or mistake. UnitedStates v. Guay (4th Cir. 1997), 108 F.3d 545, 551. The fact of knowledge or willfulness may be established by direct or circumstantial evidence. The element of knowledge or willfulness may be satisfied by an inference drawn from proof that a defendant closed his eyes to or acted in deliberate ignorance of what would otherwise have been obvious to him. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge. United States v. Threadgill (5th Cir. 1999), 172 F.3d 357.
The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposefully contrived to avoid learning of the illegal conduct in order to have a defense in the event of a subsequent prosecution. United States v. Brandon (1st Cir. 1994),17 F.3d 409, 452. The inference need not be shown by overt or physical acts. United States v. Neville (7th Cir. 1996), 82 F.3d 750, 760. The instruction is appropriate "when there is evidence that the defendant has his suspicion aroused but then . . . deliberately omits making an inquiry in order to avoid having actual knowledge." United States v. Aquilar (9th Cir. 1996),80 F.3d 329, 331. A willful blindness instruction may be appropriate if separate and distinct evidence supporting a defendant's deliberate avoidance of knowledge is admitted at trial and the possibility exists that the jury does not credit the evidence of direct knowledge. United States v. Bilis (1st Cir. 1999),170 F.3d 88.
Appellant argues that the deliberate ignorance instruction was not supported by the evidence. Appellant submits that no evidence was admitted at trial showing that appellant was informed of the source of the money. Appellant reiterates that he was not an officer, director, trustee, or agent of Black on Black.
It already has been shown that appellant was part of the inner circle of Black on Black. Appellant was present at the executive sessions during which the money was discussed in detail. He arranged for some of the funds to be spent on vehicles and helped Penn to be put in charge of Fun Tours. Appellant apparently had a close relationship with Hasan. There was evidence Hasan was told directly about the source of the money and was instructed to make a telephone call for further information. There also was evidence admitted below that a confirmation form showing the transaction number of the wire transfer, the amount, and the source should have been mailed to McKoy's barbershop. Black on Black received its banking statements at this address.
Appellant's co-defendant Arthur McKoy placed the issue of Black on Black's deliberate ignorance in issue with his testimony. McKoy stated he left it to Hasan to discover the source of the money. McKoy testified that he never wondered why someone would give Black on Black such an odd amount of money. McKoy did not contact the bank himself to ask any questions. Penn testified that McKoy stated that Black on Black might have to return all the money if someone came looking for the money or inquiring about the money. This statement alone implies McKoy at least was suspicious about the source of the funds yet McKoy testified he never made any personal inquires.
There was enough testimony admitted at trial to support a deliberate ignorance instruction. Appellant was often in the company of Hasan, who either knew or should have known that the money came from Cleveland. Hasan and appellant worked closely together to determine the manner in which the funds would be distributed and spent. Appellant either knew or should have known the money did not legally belong to Black on Black but he participated in spending the money. Most of the expenditures made by appellant were for appellant's personal benefit.
Further, the trial court instructed the jury that negligence, carelessness, or foolishness on the part of the defendants would not be enough to infer knowledge. See United States v. Withers
(4th Cir. 1996), 100 F.3d 1142. A review of the jury instructions in its entirety reveals no error.
Appellant's sixth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, P.J. and TIMOTHY D. McMONAGLE, J. CONCUR.
 ____________________________ LEO M. SPELLACY JUDGE